LILLIAN WILLEVER, PLAINTIFF-APPELLANT, v. THE DEL-
AWARE, LACKAWANNA AND WESTERN RAILROAD
COMPANY, DEFENDANT-APPELLEE.

Submitted July 10, 1916—Decided November 20, 1916.

1. Where, as a part of its operating system, a common carrier by
railroad in interstate commerce has provided, and notified its
employes of, a rule that in the "movement of trains" when "cars
are pushed by an engine," a man shall take "a conspicuous posi-
tion on the front end of the leading car to signal the engineman
in case of need," and an employe, so notified of the rule, who,
in the performance of his duties, has, in reliance upon the rule,
placed himself two hundred feet in front of a long train of
empty freight cars not being "drilled" and standing on a track
not used for "drilling" purposes, without engine or crew, is run
down because a train crew attached an engine to the far end
of the train and without warning pushed it over him, without
a man being placed on the front end of the leading car in ac-
cordance with the rule, the question of the negligence of the
train crew, the common carrier's employes, was properly left to
to the jury. Citing *D'Agnostino* v. *Pennsylvania Railroad Co.*,
72 *N. J. L.* 358, and *Germanus* v. *Lehigh Valley Railroad Co.*,
74 *Id.* 662.

2. The "assumption of risk" of a section-gang foreman engaged in
interstate commerce in the employ of a common carrier by rail-
road, whose duty it is to look out for the safety of himself as
well as of the men under him, does not include the negligence
of his fellow-employes under the Federal Employers' Liability
act in failing to take a precaution or give a warning provided
with his knowledge, to secure his safety by the system adopted by
his employer for the operation of the railroad upon which he
worked. Distinguishing *Precodnick* v. *Lehigh Valley Railroad
Co.*, 74 *N. J. L.* 566.

On appeal from the Supreme Court, whose opinion is re-
ported in 87 *N. J. L.* 348.

For the appellant, *Herbert C. Gilson* (*William C. Gebhardt*
on the brief).

For the appellee, *Frederic B. Scott*.

The opinion of the court was delivered by

WHITE, J.  This is an appeal from a decision of the Supreme Court reversing a judgment of the Hunterdon County Common Pleas entered upon a verdict of a jury in favor of the plaintiff, the widow and administratrix of one William Willever, who was run over and killed by a train of empty freight cars of the defendant railroad company while he was working in the employ of that company as foreman of a section gang in its "yard," at Port Morris, in Morris county.

The action is based upon the Federal Employers' Liability act, and its amendments, making common carriers by railroad while engaged in interstate commerce liable for injury to, or death of, their employes, resulting in whole or in part from the negligence of the officers, agents or employes of such carriers.

The Supreme Court decided that there was no error in the action of the learned trial judge regarding the question of the accident having occurred while the deceased was employed in interstate commerce, and the correctness of this decision is conceded by the appellee, the defendant company.

Upon the other question involved, namely, was there evidence to support a finding of negligence on the part of the employes of the defendant company, we find ourselves unable to agree with the conclusion reached by the Supreme Court. That conclusion is expressly predicated upon an understanding of the facts as set forth in the opinion in the following language: "The decedent was a section foreman of the defendant company, and he, and the men under him, were required to keep in order the tracks and switches in the Port Morris yard. This yard was used for the breaking up, temporary storage and making up of trains which were devoted to interstate, as well as intrastate, commerce. Decedent had held the position of foreman for five years preceding the date of his death. Shortly before the accident occurred he was at work with his gang repairing certain switches in the yard. He left these switches to go to some other point in the yard— where, or for what purpose, the evidence does not show. As he was crossing track No. 5 he was run down at the switch

connecting that track with another by a freight train which was being backed down the yard by a yard engine, and which was moving about as fast as a man walks. The testimony showed that no warning was given to the deceased by those in charge of the movement of this train, or by any other employe of the company of its approach. * * * A rule of the company which was put in evidence reads as follows: 'When cars are pushed by an engine a man must take a conspicuous position on the front end of the leading car and signal the engineman in case of need,' but there is nothing in the wording of this rule to suggest that it was promulgated for the protection of employes engaged at work in the defendant company's yards, and proof is uncontradicted that it has no application to the movement of engine and cars therein, but only for the guidance of employes upon trains moving upon the road itself."

We think the Supreme Court overlooked evidence from which the jury were justified in drawing a picture materially different from that presented by the above-quoted language, and, of course, the case being before that court upon appeal, and not on a rule to show cause, it is the existence and not the preponderance of justifying evidence that is controlling.

We think there was evidence from which the jury were justified in finding—(a) that Willever, when run over, was not crossing the track, but was at work in pursuance of the duties of his employment in cleaning snow and ice from the switch where he was killed: (b) that when he placed himself in the position, at work at that switch, which he occupied when he was run over, a train of empty freight cars nearly a quarter of a mile long was on the same track only about two hundred feet away, standing "dead"—that is, without engine attached or crew in charge, on a track and in a portion of the yard not used for "drilling" purposes, but only used to run trains in on in taking them to the portion of the yard about half a mile away, which was used for "drilling" purposes; (c) that he saw that this train of empties was not being "drilled," and that no yard engine or locomotive was near them when he started to work at the switch; (d) that after

he had placed himself in this position, probably facing away from the train in order to watch out for danger from the other direction, relying on the observance of the rule above quoted to protect him against the movement in his direction of the train of empties, a yard engine with its crew went out from the "drilling" portion of the yard about half a mile away, and attached to the other end of this train of empties, and, without warning of any kind, commenced to push them silently toward Willever, without his knowing it and without reasonable care being first taken to ascertain that the track was clear where Willever was at work, and without a man taking "a conspicuous position on the front of the leading car to signal the engineman in case of need," as required by the rule (No. 102) above referred to; (e) that instead of the evidence being uncontradicted as to this rule not being for the protection of employes in defendant's yards, and having no application to the movement of engines and cars therein, and being only for the guidance of employes upon trains moving upon the road itself (as understood to be the case by the Supreme Court). there was evidence indicating that the rule did apply to the "movement of trains" within as well as without the company's yards where such movement fell within the language of the rule and the heading or subdivision under which it occurred in the book of rules, as distinguished from the process of "drilling" in the yards, and that such rule constituted a part of the system established by the defendant company for the movement of the trains to which it applied, in order, *inter alia*, to secure the safety of its employes, and (f) that what was done to this string of empty freight cars on the morning in question fell within the application of this rule, and that Willever, who had been furnished by the company with a copy of the book of rules containing it, relied for his safety upon the observance of its provisions, and that his death resulted from the neglect of the employes of the defendant company to carry out those provisions.

The evidence which, taken in connection with the other evidence in the case, we think formed a proper basis for such findings may be summarized briefly as follows: The "yard"

mentioned was about two and one-quarter miles long and had in its widest part about forty tracks in all. There were six principal or main tracks upon which the trains were brought into the yard. The track upon which the accident occurred, "No. 5," or the "mud-track," was one of those six. O'Neill, a switchman in the employ of defendant company, testified regarding this track: "It isn't used for drilling; it's used for pulling trains in to be drilled." Upon this track a train of empty freight cars without any locomotive attached had been left standing, apparently over night, after having been brought in late the afternoon or night before from Maybrook, in the State of New York. The train comprised twenty-seven empty freight cars and was nearly a quarter of a mile long. Its nearest end was about half a mile short of, or away from, the "drilling" portion of the yard. Willever (the deceased), a section foreman, one of whose duties was to look out for the safety of himself and of the men under him while at work, was with his gang of two men at work cleaning the ice and snow from the switches in the yard and along these tracks on the morning in question. He put one of his men to work on one switch, and the other to work on another switch, both on an adjoining track, and then, telling them to watch out 'for trains, took a hammer in his hand and, about twenty minutes before the accident, left them and went around the end of some intervening cars or cabooses out of sight towards the switch where he was killed, on track No. 5, which switch was about three hundred feet from where he left his men. He was run over at this switch and the hammer was found at the switch. No one saw him after he left his men until just after he was run over. The switch in question was six car lengths (about two hundred feet) from the east end of the train of twenty-seven empty freight cars. Within a few minutes after Willever went to the switch two hundred feet in front of the eastwardly end of this string of empty freight cars, a switch engine with its crew, in pursuance of orders given about nineten A. M. by the general yardmaster to get this string of empties and bring them to the "drilling" yard, went out to the "west tower" and backed up to the westerly end of the

string, and, without warning of any kind, started to push them eastwardly toward the switch where Willever was working. The testimony was that Willever left his men about twenty minutes before the accident occurred, that the yardmaster gave the order to go after this string of empties about nine-ten, and that the accident occurred about nine-twenty-five. The switching crew consisted of the engineer in the engine, the conductor, who was on top of the *west* end of the front or eastwardly car of the string, a brakeman, who released the brakes and who was on top of the fifth car from the engine, and a switchman, who was in the "drilling" yard half a mile away seeing that the switches in that yard were properly set and the track there kept clear for this incoming train. The conductor, from his position on the *rear end* of the front car, gave the signal to start back and it was relayed by the brakeman to the engineer, who obeyed it. When the end or eastwardly car had gone six car lengths (about two hundred feet) at a speed "about as fast as you could walk," the conductor heard a man "holler," and, ᴸ the same moment, felt a bump and the wheels of the fr· ₊c truck became derailed, and looking down he saw Willever lying by the track with his legs run over, as a result of which he died in a little while. The conductor, who had not seen Willever before this, at once gave the stop signal, which was relayed by the brakeman to the engineer, who brought the train to a stop with the eastern end about twenty or twenty-five feet beyond the switch and the place where Willever lay. The rule No. 102, above quoted, was contained in a book of rules under the sub-heading "Movement of Trains." Some witnesses testified that this book of rules was for the operation of trains out on the main line only and was not intended to apply to yard work, but one of these witnesses testified, under cross-examination, that there were certain things in the book of rules which did apply to yard work. The evidence also showed that the book of rules was given to employes whose duties were exclusively within the yards as well as to employes who worked or ran trains on the main lines. Willever was furnished by the company with a copy of this book of rules. There was nothing in the book of

rules to indicate that rule No. 102 had no application to "movement of trains" within yard limits, nor was there any evidence that Willever had ever been told that it did not so apply within those limits. The language of the rule itself is: "When cars are pushed by an engine," and the subdivision under which it occurs is headed "Movement of Trains."

Assuming, therefore, that the verdict of the jury in favor of the plaintiff was a finding of the above facts, and that there was evidence to justify such finding, the question before us is, can the plaintiff recover? The Supreme Court, under the facts as it understood them, thought not, for two reasons, namely—*first,* because it thought there was no duty to give warning in the yards, and *second,* because it was Willever's duty as a section foreman (as the evidence shows he had been instructed and knew) to look out for his own safety as well as for the safety of the men under him. *Aerkfetz* v. *Humphreys,* 145 *U. S.* 418, is cited as authority for the first reason, and *Precodnick* v. *Lehigh Valley Railroad Co.,* 74 *N. J. L.* 566, for the second.

In the Aerkfetz *v.* Humphreys case the court said, in speaking of a track repairer who was run over in a "drilling" yard: "The plaintiff was an employe, therefore the measure of duty to him was not such as to a passenger or a stranger. As an employe of long experience in that yard, he was familiar with the moving of cars forward and backward by the switch engine. The cars were moved at a slow rate of speed. * * * He knew that the switch engine was busy moving cars and making up trains, and that at any minute cars were likely to be moved along the track upon which he was working. * * * There could have been no thought or expectation on the part of the engineer, or of any other employe, that he would pay no attention to his own safety. Under such circumstances, what negligence can be attributed to the parties in control of the train, or the management of the yard? They could not have moved the cars at any slower rate of speed. They were not bound to assume that any employe familiar with the manner of doing business would be wholly indifferent to the going and coming of the cars. There were no strangers whose pres-

ence was to be guarded against. The ringing of bells and the sounding of whistles of trains going and coming, a switch engine moving forwards and backwards, would have simply tended to confusion. The person in direct charge had a right to act on the belief that the various employes in the yard, familiar with the continually recurring movement of the cars, would take reasonable precaution against their approach. The engine was moving slowly; so slowly that any ordinary attention on the part of the plaintiff, to that which he knew was a part of the constant business of the yard, would have made him aware of the approach of the cars and enabled him to step one side as they moved along the track. It cannot be that under these circumstances the defendants were compelled to send some man in front of the cars for the mere sake of giving notice to employes who had all the time knowledge of what was to be expected. We see in the facts as disclosed no negligence on the part of the defendant."

This language, it seems to us, clearly indicates a material difference between the case *sub judice* and the class of "drilling" yard work cases to which it applies. In the Aerkfetz case the deceased "knew that the switch engine was busy moving cars and making up trains, and that at any minute cars were likely to be moved along the track where he was working." He knew that he was in a place where they were "drilling" cars in making up new trains, and that in that operation (under the system established for that purpose) cars were shunted back and forth, individually, and in groups without warning, and without lookouts being posted to see that employes were not in the way. In the present case, on the contrary, the deceased knew that he was in a place where "drilling" was not carried on, where cars were not being shunted about in making up trains, and as to the quarter-of-a-mile-long train of empty freight cars standing on an incoming track, with no engine attached nor crew in charge, that he was protected by one of the rules forming a part of the system established by the defendant company for the "movement of trains" which required that if that train were moved in his direction by being pushed from the other end, a man was

required to first take "a conspicuous position on the front end of the car" nearest him "to signal the engineman in case of need," and that a man so placed would of course see him at his work on the track only two hundred feet in front and not give the signal to start backing without warning to him to get out of the way. *Albanese* v. *Central Railroad Co.,* 70 *N. J. L.* 241.

We think the essential difference between the two cases consists in the fact that here the cars, before the engine and crew came after them, were in a place and in a condition which indicated that they were not being "drilled," nor subject to being "drilled," but that, on the contrary, they, when moved, would only be moved as a "train" from that place to some other place, and, therefore, in accordance with the rules of the system applicable to the "movement of trains" provided for the safety of the employes whose duties took them on the track in front. We think the present case falls rather within that line of cases ilustrated by *D'Agnostino* v. *Pennsylvania Railroad Co.,* 72 *N. J. L.* 358, in the Supreme Court, and *Germanus* v. *Lehigh Valley Railroad Co.,* 74 *Id.* 662, in this court, both of which hold that where a system or custom of warnings under certain circumstances is established, the employes involved had the right to rely upon such warning being given, and that failure to give them, resulting in injury, constitutes a cause of action.

Turning now to the second point relied upon by the Supreme Court, it is said that Willever, having received instruction and knowledge, as section foreman for five years, that he must look out for his own safety, the defendant company, under the doctrine of assumption of risk, as applied in the case of *Precodnick* v. *Lehigh Valley Railroad Co., supra,* was, as to him, under no duty to give warning. We do not think the negligence of defendant's employes in failing to comply with a rule established for Willever's safety, was one of the dangers he undertook to look out for, and, therefore, one of the risks he assumed. Obviously, Willever's undertaking to look out for his own safety is, to a certain extent, a relative assumption, and, therefore, prescribed by the limit of dangers

incident to his employment under the system established for the operation of the business. This is necessarily so. Suppose, for instance, it had been Willever's duty to go under the standing freight cars in question and to do his work there in a position where he could not possibly see the new danger and escape in time when the engine backed up to and started to push the train without warning to him, and that under a system provided by the employer with his knowledge a man was stationed alongside to watch and warn, and that the man so on watch had negligently failed to see and warn, and Willever had been run over in consequence, no one would contend that under the Federal Employers' Liability act, making the employer liable for the negligence of fellow-employes, Willever's assumption of risk had included this act of negligence. And so, in the case here presented, feeling, as we do, that the jury were justified by the evidence in finding a condition or state of facts which made rule No. 102 applicable, we think Willever had the right, under the system of which that rule formed a part, to rely upon the care prescribed by that rule being taken by his fellow-employes for his protection, and that he, consequently, did not assume the risk of its negligent omission.

· For the reasons herein expressed, the judgment of the Supreme Court is reversed and the judgment of the Court of Common Pleas of Hunterdon county is affirmed, with costs.

*For affirmance*—SWAYZE, TRENCHARD, PARKER, BERGEN, WILLIAMS, JJ.  5.

*For reversal*—THE CHANCELLOR, KALISCH, BLACK, WHITE, HEPPENHEIMER, TAYLOR, GARDNER, JJ.  7.